# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

UNITED SUPPLIERS, INC.,

        Plaintiff/Counter
        Defendant,

vs.

MILLARD FEED MILL, INC.,

        Defendant/Counter
        Claimant.

No. 09-CV-107-LRR

**ORDER**

_____

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *SUBJECT MATTER JURISDICTION* . . . . . . . . . . . . . . . . . . . *3*

*IV.*   *SUMMARY JUDGMENT STANDARD* . . . . . . . . . . . . . . . . . . . *4*

*V.*    *VIOLATIONS OF THE LOCAL RULES* . . . . . . . . . . . . . . . . . . . *4*

    *A.*    *Millard Feed's Violations* . . . . . . . . . . . . . . . . . . . . . *4*
    *B.*    *United Suppliers' Violation* . . . . . . . . . . . . . . . . . . . *6*

*VI.*   *RELEVANT FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . *6*

    *A.*    *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
    *B.*    *The Subject Contracts* . . . . . . . . . . . . . . . . . . . . . . *7*
        *1.*    *Contract no. 81299* . . . . . . . . . . . . . . . . . . *7*
        *2.*    *Contract no. 81348* . . . . . . . . . . . . . . . . . . *8*
        *3.*    *Contract no. 81424* . . . . . . . . . . . . . . . . . . *9*
        *4.*    *Contract no. 81425* . . . . . . . . . . . . . . . . . *10*
    *C.*    *Laufenberg and Quad States* . . . . . . . . . . . . . . . . *10*
    *D.*    *Quad States Merges with United Suppliers* . . . . . . . *13*
    *E.*    *Types of Transactions* . . . . . . . . . . . . . . . . . . . . . *15*
        *1.*    *"Open" agreements* . . . . . . . . . . . . . . . . . *15*
        *2.*    *"Prepay" contracts* . . . . . . . . . . . . . . . . . *16*
        *3.*    *"Downpay" contracts* . . . . . . . . . . . . . . . . *17*

    F.     *Tender of Release Numbers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**

    G.    *The "Cancellation" or Adjustment of Contracts* . . . . . . . . . . . . . . **20**

    H.    *Parties' Performance Under the Subject Contracts* . . . . . . . . . . . **22**

    I.      *Form Contract Changes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

    J.     *Decline in the Fertilizer Market* . . . . . . . . . . . . . . . . . . . . . . . . . **24**

    K.    *Cook's Discussions with United Suppliers Representatives* . . . . . . . **24**

    L.    *United Suppliers' Collection Efforts* . . . . . . . . . . . . . . . . . . . . . . **26**

    M.    *United Suppliers' Mitigation Efforts* . . . . . . . . . . . . . . . . . . . . . . **27**

**VII.**  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

    A.    *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

    B.    *Parties' Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

           1.    *United Suppliers' arguments* . . . . . . . . . . . . . . . . . . . . . . **30**

           2.    *Millard Feed's arguments* . . . . . . . . . . . . . . . . . . . . . . . . **30**

    C.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

           1.    *United Suppliers' cancellation or breach of*

                *the Subject Contracts* . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

           2.    *The parties "actual" agreement* . . . . . . . . . . . . . . . . . . . . **36**

           3.    *Breach of fiduciary duty* . . . . . . . . . . . . . . . . . . . . . . . . . **40**

           4.    *Damages* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

                a.    *Identification of product* . . . . . . . . . . . . . . . . . . . **43**

                b.    *Notice* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**

                c.    *Reasonableness of resales* . . . . . . . . . . . . . . . . . **46**

                d.    *Evidence of damages* . . . . . . . . . . . . . . . . . . . . . **47**

           5.    *Affirmative defenses and counterclaim* . . . . . . . . . . . . . . **48**

**VIII.**  **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**

## I.  INTRODUCTION

The matters before the court are Plaintiff/Counter Defendant United Suppliers, Inc.'s "Motion for Summary Judgment" ("Motion") (docket no. 35) and "Motions in Limine" (docket no. 44) and Defendant/Counter Claimant Millard Feed Mill, Inc.'s "Motions in Limine" (docket no. 43).

## II.  PROCEDURAL BACKGROUND

On August 11, 2009, United Suppliers, Inc. ("United Suppliers") filed a Complaint

(document no. 1) against Millard Feed Mill, Inc. ("Millard Feed"). United Suppliers alleges that Millard Feed breached four contracts in which Millard Feed agreed to purchase fertilizer from United Suppliers.

On February 5, 2010, Millard Feed filed an Answer and Counterclaim (docket no. 30). Millard Feed denies that it breached the contracts and asserts affirmative defenses.[1] Millard Feed also asserts a counterclaim in which it seeks a refund for certain "advance down payments" for fertilizer that it alleges United Suppliers failed to deliver. Counterclaim at ¶¶ 6-8. On February 25, 2010, United Suppliers filed an "Answer to Counterclaim" (docket no. 31), in which it denied the substance of Millard Feed's Counterclaim.[2]

On October 22, 2010, United Suppliers filed the Motion. On November 22, 2010, Millard Feed filed a Resistance (docket no. 40). On December 3, 2010, United Suppliers filed a Reply (docket no. 42). Neither side requests oral argument on the Motion. The Motion is fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

There is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000. The court is satisfied that it has diversity subject matter jurisdiction over the instant action. *See* 28 U.S.C. § 1332(a).

---

[1] In its Answer and Counterclaim, Millard Feed asserts seven affirmative defenses: (1) failure to state a claim; (2) failure to mitigate damages; (3) excused performance due to United Suppliers' prior breach; (4) excused performance by agreement of the parties established expressly or through their course of dealing, course of performance or usage of trade; (5) illusory consideration; (6) unconscionability; and (7) a setoff for advance down payments. On January 12, 2011, Millard Feed filed "Amended Affirmative Defenses" (docket no. 49), alleging that United Suppliers breached a fiduciary duty it owed to Millard Feed. *See* Amended Affirmative Defenses at ¶¶ 7-8.

[2] On January 14, 2011, United Suppliers filed an "Amended Answer to Counterclaim with Affirmative Defenses" (docket no. 55).

3

## IV.  SUMMARY JUDGMENT STANDARD[3]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  "[T]o establish the existence of a genuine issue of material fact, 'a [non-moving party] may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)).  Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873).  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.  *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V.  VIOLATIONS OF THE LOCAL RULES

Both parties failed to comply with the court's Local Rules.  The court addresses their violations here, before turning to the merits of the Motion.

### A.  Millard Feed's Violations

As required by Local Rule 56.b, Millard Feed filed a "Statement of Facts in Resistance to Motion for Summary Judgment" ("MF Statement of Facts") (docket no. 40-

---

[3] An amended version of Federal Rule of Civil Procedure 56 became effective on December 1, 2010, while the Motion was pending.  However, "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56 advisory committee's note.

4

2). *See* LR 56.b.3 (directing the resisting party to file "[a] statement of additional material facts that [it] contends preclude summary judgment"). However, Millard Feed failed to comply with Local Rule 56.b's requirement that "[e]ach individual statement of additional material fact must be . . . supported by references to [the specific portions of the record] . . ., *with citations to the appendix containing that part of the record*." LR 56.b (emphasis added); *see also* LR 56.e ("The resisting party's appendix must include those parts of the [record] . . . upon which the resisting party relies in resisting the motion.").

At the time it filed its Resistance, at least twenty-two of Millard Feed's Statements of Fact included citations to documents, mostly deposition excerpts, that Millard Feed failed to include in its Appendix. *See* MF Statement of Facts at ¶¶ 10, 11, 12, 13, 14, 15, 16, 20, 23, 25, 27, 29, 35, 45, 48, 51, 60, 61, 63, 64, 65 and 66. As a result, many of these Statements of Fact were only partially supported or, in some cases, unsupported entirely. In its Reply, United Suppliers asked the court to strike these Statements of Fact due to Millard Feed's failure to include the cited documents in its Appendix.[4]

On January 13, 2011, Millard Feed filed a "Supplemental Appendix in Resistance to Plaintiff's Summary Judgment Motion" ("MF Supp. App'x") (docket no. 40-7).[5] In its Supplemental Appendix, Millard Feed sets forth the "missing" deposition excerpts. Accordingly, the court declines to strike the Statements of Fact at issue, despite the original deficiencies in Millard Feed's Appendix.

---

[4] The court notes, however, that United Suppliers admits many of the Statements of Fact at issue and simply contends they are immaterial.

[5] Millard Feed explained that it had "inadvertently omitted from its appendix . . . some of the deposition transcript pages cited in its statement of facts." Motion for Leave to File Supplemental Appendix (docket no. 52) at 2. However, Millard Feed does not explain why it waited nearly eight weeks after filing its Resistance to seek leave to supplement its appendix. This is particularly perplexing given United Suppliers' request—on December 3, 2010—that the court strike more than twenty of Millard Feed's Statements of Fact due to missing deposition excerpts.

## B. United Suppliers' Violation

For its part, United Suppliers included with its Reply a document not contemplated by the Local Rules. Specifically, United Suppliers filed a "Reply to [Millard Feed's] Response to [United Suppliers'] Statement of Material Facts in Support of Motion for Summary Judgment" ("Reply to Millard Feed's Response") (docket no. 42-1). This document is not included in Local Rule 56.d, which identifies the items a moving party may, and in some cases must, file in response to the resisting party's documents.

A moving party must file "a reply in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of additional fact." LR 56.d. United Suppliers did this. *See* United Suppliers' "Reply to [Millard Feed's] Statement of Facts in Resistance to Motion for Summary Judgment" ("US Reply to MF Statement of Facts") (docket no. 42-2). The moving party also may, and United Suppliers did, file a Reply Brief (docket no. 42). United Suppliers also filed, however, its Reply to Millard Feed's Response. This document is not contemplated by Local Rule 56.d and the court will not consider it in any way.[6]

## VI. RELEVANT FACTUAL BACKGROUND

Viewed in the light most favorable to the non-moving party, Millard Feed, and affording it all reasonable inferences, the relevant facts are as follows:

### A. Parties

United Suppliers is an Iowa corporation with its principal place of business in Eldora, Iowa. United Suppliers is a wholesale supplier of farm-related products, including fertilizer. It is a cooperative owned by its members.

Millard Feed is a Wisconsin corporation with its principal place of business in Elkhorn, Wisconsin. Millard Feed is both a customer and a member-owner of United

---

[6] The court notes that the filing of such a document could be used to circumvent the page limitation on reply briefs. *See* LR 7.g (limiting reply briefs to five pages).

Suppliers. Robert Cook is Millard Feed's president and sole owner. Cook has a Bachelor of Science degree in Agronomy from the University of Wisconsin. He started working at Millard Feed in 1982 and purchased the business in 1997 or 1998.

## B. *The Subject Contracts*

In July of 2008, the parties executed four contracts in which Millard Feed agreed to buy fertilizer from United Suppliers: Contract No. 81299, Contract No. 81348, Contract No. 81424 and Contract No. 81425.[7] Each of the Subject Contracts is a two page document printed on a single sheet. They each contain a "CONTRACT TYPE" designation stating that they are "Prepay" contracts. United Suppliers' Appendix ("US App'x") (docket no. 35-2) at 1, 3, 5 & 7. The Subject Contracts provide for a specified "initial payment" amount[8] that is due by a certain date, with the balance due some date thereafter. *Id.* They also state that "A 1% PER MONTH LATE PAYMENT PENALTY WILL BE ASSESSED AFTER DUE DATE." *Id.* Three of the Subject Contracts[9] provide, on the back of the one page document, that United Suppliers may recover all expenses, including reasonable attorneys' fees, incurred "to collect any payments secured hereunder or to enforce any rights in the collateral." *Id.* at 4, 6 & 8.

### 1. *Contract no. 81299*

Contract No. 81299 bears a contract date of July 7, 2008. On July 10, 2008, Matthew Carstens, a division manager for United Suppliers, executed the contract on United Suppliers' behalf. Although it does not reflect when he did so, Robert Cook signed the contract on Millard Feed's behalf.

Contract No. 81299 reflects that Millard Feed agreed to purchase 200 tons of

---

[7] The court refers to the four contracts collectively as the "Subject Contracts."

[8] The initial payment under each Subject Contract was 25% of the total price.

[9] Contract Nos. 81348, 81424 and 81425

fertilizer, at $1,025 per ton, from United Suppliers. The contract includes the following terms: "INITIAL PAYMENT DUE 7/21/2008 IN THE AMOUNT OF $51,250.00, BALANCE DUE 3/1/2009 IN THE AMOUNT OF $153,750.00." US App'x at 1. The contract indicates a "pull" period[10] of "MARCH, APRIL, MAY & JUNE 2009." *Id.* Contract No. 81299 states:

> THIS CONTRACT, GOVERNED BY THE TERMS AND CONDITIONS APPEARING ON THE FACE AND REVERSE SIDE, BECOMES BINDING UPON RECEIPT OF WRITTEN ACCEPTANCE AND ANY DEPOSITS REQUIRED AS STATED ABOVE.

*Id.*

Millard Feed paid the initial payment of $51,250. However, it has failed to pay the balance of $153,750. United Suppliers did not make the product under Contract No. 81299 available to Millard Feed.[11]

### 2. Contract no. 81348

Contract No. 81348 bears a contract date of July 15, 2008. On July 17, 2008, Matthew Carstens executed the contract on United Suppliers' behalf. On July 19, 2008,

---

[10] Cook testified that the "pull period" is "the time the product would be available for pick-up." Millard Feed Appendix ("MF App'x") (docket nos. 40-3 through 40-5) at 23-24. Likewise, United Suppliers notes that "the pull period dates would be the time period within which the fertilizer product would be made available for Millard Feed to pick up . . . ." US Reply to MF Statement of Facts at ¶ 56.

[11] The parties agree that United Suppliers never made the fertilizer available to Millard Feed. However, they have very different views as to why that is. United Suppliers simply argues that it did not make the product available because Millard Feed failed to pay the balance due. Millard Feed contends that the Subject Contracts do not "accurately reflect the agreement of the parties" and that "United Suppliers did not make product available because it canceled the contracts." Millard Feed's "Response to Plaintiff's Statement of Material Facts in Support of Motion for Summary Judgment" ("Millard Feed's Response") (docket no. 40-1) at ¶ 15.

Robert Cook signed the contract on Millard Feed's behalf.

Contract No. 81348 reflects that Millard Feed agreed to purchase 100 tons of fertilizer, at $496 per ton, from United Suppliers. The contract includes the following terms: "INITIAL PAYMENT DUE 7/30/2008 IN THE AMOUNT OF $12,400, BALANCE DUE 3/1/2009 IN THE AMOUNT OF $37,200.00." *Id.* at 3. The contract indicates a "pull" period of "APRIL, MAY & JUNE 2009." *Id.* Contract No. 81348 states:

> THIS CONTRACT, GOVERNED BY THE TERMS AND CONDITIONS APPEARING ON THE FACE AND REVERSE SIDE, BECOMES BINDING UPON RECEIPT OF WRITTEN ACCEPTANCE.

*Id.*

Millard Feed paid the initial payment of $12,400. However, it has failed to pay the balance of $37,200. United Suppliers did not make the product under Contract No. 81348 available to Millard Feed.

### 3. *Contract no. 81424*

Contract No. 81424 bears a contract date of July 28, 2008. On July 29, 2008, Matthew Carstens executed the contract on United Suppliers' behalf. On July 31, 2008, Robert Cook signed the contract on Millard Feed's behalf.

Contract No. 81424 reflects that Millard Feed agreed to purchase 1,300 tons of fertilizer, at $545 per ton, from United Suppliers. The contract includes the following terms: "INITIAL PAYMENT DUE 8/15/2008 IN THE AMOUNT OF $177,125.00, BALANCE DUE 3/1/2009 IN THE AMOUNT OF $531,375.00." *Id.* at 5. The contract indicates a "pull" period of "MARCH, APRIL & MAY 2009." *Id.* Contract No. 81424 states:

> THIS CONTRACT, GOVERNED BY THE TERMS AND CONDITIONS APPEARING ON THE FACE AND REVERSE SIDE, BECOMES BINDING UPON RECEIPT OF

WRITTEN ACCEPTANCE.

*Id.*

Millard Feed paid the initial payment of $177,125. However, it has failed to pay the balance of $531,375. United Suppliers did not make the product under Contract No. 81424 available to Millard Feed.

### 4. **Contract no. 81425**

Contract No. 81425 bears a contract date of July 29, 2008. On July 29, 2008, Matthew Carstens executed the contract on United Suppliers' behalf. On July 31, 2008, Robert Cook signed the contract on Millard Feed's behalf.

Contract No. 81425 reflects that Millard Feed agreed to purchase 400 tons of fertilizer, at $900 per ton, from United Suppliers. The contract includes the following terms: "INITIAL PAYMENT DUE 8/15/2008 IN THE AMOUNT OF $90,000.00, BALANCE DUE 1/15/2009 IN THE AMOUNT OF $270,000.00." *Id.* at 7. The contract indicates a "pull" period of "MARCH, APRIL & MAY 2009." *Id.* Contract No. 81425 states:

> THIS CONTRACT, GOVERNED BY THE TERMS AND CONDITIONS APPEARING ON THE FACE AND REVERSE SIDE, BECOMES BINDING UPON RECEIPT OF WRITTEN ACCEPTANCE.

*Id.*

Millard Feed paid the initial payment of $90,000. However it has failed to pay the balance of $270,000. United Suppliers did not make the product under Contract No. 81425 available to Millard Feed.

### C. *Laufenberg and Quad States*

Until his retirement in October 2008, David Laufenberg was a United Suppliers sales representative. Laufenberg often dealt with sales to Millard Feed, including the transactions underlying the Subject Contracts.

Prior to working for United Suppliers, Laufenberg owned his own company, Quad States Suppliers ("Quad States"). Quad States, like United Suppliers, sold fertilizer to wholesale customers. From about 1990 to 1993, Millard Feed was a customer of Quad States. When he did business as Quad States, Laufenberg would telephone Cook to discuss market conditions, pricing, quantities available, shipment and purchase price. During this time, Laufenberg also made personal visits to Millard Feed, during which he would discuss the current state of the fertilizer industry and pricing.

When Laufenberg did business as Quad States, he never used written contracts when dealing with Cook. Rather, Laufenberg described them as oral "gentleman's agreement[s]." MF App'x at 50. Nonetheless, Laufenberg testified that his agreements with Cook were memorialized in an invoice, which Quad States sent to Millard Feed. Other than invoices, there was no paperwork involved when Laufenberg, doing business as Quad States, dealt with Millard Feed.

During the three years when Laufenberg did business with Millard Feed as Quad States, Millard Feed and Quad States engaged in several different kinds of transactions. Laufenberg described some as "open load" transactions and others as "prepay" transactions.[12] US App'x at 32. When Quad States and Millard Feed entered into an oral agreement for an "open load" or "open purchase" transaction, Laufenberg would arrange to have fertilizer shipped to Millard Feed with the understanding that Millard Feed would make payment either upon delivery or at some specific date after delivery. MF Statement of Facts at ¶ 12. The "open load" or "open purchase" transactions between Quad States

---

[12] The parties and witnesses refer to the "open load" transactions interchangeably as "open purchase" agreements, or simply as "open" agreements. The court does the same, with the understanding that all such terms refer to an agreement in which the buyer takes possession of the goods prior to payment. *See* MF App'x at 58 (testimony of Laufenberg that in an "open purchase transaction, the dealer would actually get the fertilizer before the payment was due").

and Millard Feed sometimes included a down payment requirement, where Millard Feed would pay a portion of the contract price down. *Id.* at ¶ 13. Millard Feed would pay the balance at a later date, after delivery of the fertilizer.

Under the "open load" or "open purchase" transactions, Laufenberg, on behalf of Quad States, would agree to sell product to Cook, on behalf of Millard Feed, at a specific price. *Id.* at ¶ 14. When the product became available, Laufenberg would provide Cook with "load numbers," also referred to as "pull numbers" or "pick up numbers." *Id.* Cook would then "pull" the product, which meant that either Laufenberg or Cook would arrange to have the product shipped to Millard Feed in Wisconsin. *Id.*

In addition to "open purchase" transactions, Laufenberg testified that Quad States and Millard Feed entered into "prepay" agreements. MF App'x at 52. Laufenberg explained "prepay" transactions as follows:

> Q.   You used the word prepay. What do you mean when you talk about a prepay transaction?
>
> A.   Prepay is where you pay for it before you get the material.
>
> Q.   You pay for the entire purchase price of the fertilizer product before you get the load number and can take possession of it?
>
> A.   That's correct.

*Id.*

When Laufenberg did business as Quad States, he would carry accounts receivable with his individual dealers, including Millard Feed, for sales of fertilizer actually delivered but not yet paid for. Laufenberg had dealers who owed Quad States as much as $500,000 for delivered fertilizer product. Millard Feed, from time to time, would owe Quad States money on the purchase of fertilizer for a time period beyond what Laufenberg and Cook had originally agreed to.

Based on the history of their dealings, and Laufenberg's expertise in the fertilizer

industry, Cook trusted and relied upon Laufenberg's knowledge, opinions and advice regarding the market, pricing and product availability of fertilizer product. When considering purchases from Laufenberg, "Cook relied on the fact that Laufenberg was working for Cook to ensure that Cook was able to take advantage of market opportunities." MF Statement of Facts at ¶ 18.

### D. Quad States Merges With United Suppliers

In 1993, Quad States merged with United Suppliers. After the merger, Laufenberg began working as a United Suppliers sales representative.[13] Laufenberg testified that there "was probably not a published announcement" of Quad States' merger with United Suppliers and his new position as a United Suppliers sales representative. MF App'x at 61. However, Laufenberg testified that United Suppliers sent a letter to its customers regarding the merger and he contacted his customers by phone.[14]

After he began working for United Suppliers, Laufenberg "did not change the way in which he did business with Cook and Millard Feed." MF Statement of Facts at ¶ 21. He "continued to have telephone conversations, and made personal visits to Millard Feed, during which he would discuss pricing, market conditions, and the type and quantity of fertilizer products Millard Feed might want to buy." *Id.* Laufenberg testified that after

---

[13] Millard Feed contends that "Laufenberg was authorized to enter into contracts with Millard Feed on behalf of United Suppliers." MF Statement of Facts at ¶ 20. However, Millard Feed's citations in support of this "fact" do not support the proposition. In any event, for reasons explained below, this issue is immaterial.

[14] Millard Feed insists that there was "no announcement or published notice" of Laufenberg's merger with United Suppliers. Resistance at 4. However, Millard Feed never argues that it was *in fact* unaware of the merger or Laufenberg's status as a United Suppliers sales representative. In other words, Millard Feed never contends that Cook thought, all along, that he was dealing with an entity other than United Suppliers. Accordingly, it is immaterial whether there was an announcement or published notice of the merger.

he and Cook "sort of had an oral understanding of what Millard Feed needed," Laufenberg would complete a "settlement sheet" and fax it to United Suppliers' offices in Eldora, Iowa. United Suppliers Supplemental Appendix ("US Supp. App'x") (docket no. 42-3) at 21. Although he did not personally furnish the contracts to Millard Feed, Laufenberg testified that employees at United Suppliers' Eldora offices "would take the information off of the settlement sheet" he had prepared, "type up the contract, and that would go to the customer." *Id.*

Laufenberg never met with Cook to discuss the terms of United Suppliers' form contracts after United Suppliers sent them to Millard Feed. However, Laufenberg testified that he met with Cook "on a yearly basis" to discuss "the terms of the contract [Millard Feed] [would be] required to sign when they did business with United Suppliers on a prepaid basis[.]" *Id.* at 21. Laufenberg never received any training with respect to the use of the type of form contracts at issue in this case and did not attend management meetings in which the form contracts were discussed. Laufenberg does not recall attending any sales meetings in which the form contracts were discussed. When asked whether he "ever ha[d] any discussions with [Robert] Cook of any kind concerning the requirement that his company sign a written contract," Laufenberg testified as follows:

> A.  Other than knowing that when I started with United Suppliers that they were sending out contracts such as this here stating what we have written or what is on them, the material, the tons, the price, the initial payment, the balance due—[b]asically the front page.
>
> Q.  The front page of [one of the Subject Contracts] would be what you personally were involved in discussing and coming to an agreement on with Millard Feed?
>
> A.  Right.

MF App'x at 65.

### E. Types of Transactions

Throughout their dealings, the parties have engaged in various types of transactions for the purchase of fertilizer. Of particular relevance to this case, and discussed above with respect to Quad States, the parties entered into "open" agreements as well as "prepay" transactions.

#### 1. "Open" agreements

Millard Feed contends that, "[p]ursuant to a long time practice, Millard Feed's duty to complete a purchase of fertilizer was, in many transactions, triggered by the seller's . . . tender of release numbers."[15] MF Statement of Facts at ¶ 28. Laufenberg explained that in an "open purchase" or "open load" agreement, Millard Feed could not take possession of the product until United Suppliers contacted Millard Feed with a release number. US Supp. App'x at 20. Laufenberg testified that once United Suppliers gave Millard Feed the release number, Millard Feed would use the number "to make arrangements to have the product picked up and shipped to their Elkhorn, Wisconsin facility." *Id.* Once the product was at Millard Feed's facility, Laufenberg explained, Millard Feed would make payment. In an open load contract, Laufenberg testified, "no steps were required to be taken by either [party] until such time as [he] or someone else on [his] behalf would contact Millard Feed directly and give them the release number that they would need to go and take possession of the product[.]" MF App'x at 59.

Carstens testified that "pulling" refers to the time "when a release number has been given" to the buyer.[16] US App'x at 23. Carstens explained that "[a]t that point [United

---

[15] The parties and witnesses also refer to "release numbers" as "load numbers," "pull numbers" or "pull tickets." MF Statement of Facts at ¶ 28 n.6; US Reply to MF Statement of Facts at ¶ 28.

[16] Similarly, Laufenberg testified that the term "pull" in the context of selling fertilizer product means "going after the material and picking it up, and basically you pull

(continued...)

Suppliers has] lost control of the product and it's in the customer's hands." *Id.* Carstens testified that the method of tendering release numbers to the buyer "differs by sales rep" and there is "no standard way because customers like to get [release numbers] differently . . . ." *Id.* However, Cook testified that Laufenberg would provide release numbers to a Millard Feed employee via telephone or fax. After delivery of the product, United Suppliers would send an invoice to Millard Feed, which Millard Feed would pay.

### 2. *"Prepay" contracts*

The parties also entered into "prepay" transactions for the sale of fertilizer. US Supp. App'x at 20. In contrast to open agreements, Laufenberg testified that in a prepay transaction, United Suppliers would not provide release numbers to Millard Feed until "after the contract was paid." *Id.* He further explained:

> Q.  What if the contract was not paid in full? What would happen?
>
> A.  I guess we're seeing what's happening. That's why we're here.
>
> Q.  Let's talk in general. Now I want to talk about your general experience at United Suppliers, not necessarily just with Millard Feed, but with all of your customers from '93 to 2008. Were there times when you would enter into a prepaid contract . . . with a dealer and then the dealer would either not pay or not pay in full?
>
> A.  No.
>
> Q.  So you never had that happen during the entire time you worked for United Suppliers from '93 to 2008 other than in this case that we're here for today?
>
> A.  Not that I can recall.

*Id.* Like Laufenberg, Carstens testified that in "prepay" fertilizer contracts, United

---

[16](...continued)
the load number." US App'x at 32.

Suppliers never gave Millard Feed release numbers "before Millard Feed paid the full price under that contract." *Id.* at 15.

### 3. *"Downpay" contracts*

Millard Feed contends that "on some transactions, Millard Feed would make an initial down payment, after which it would receive release numbers, take delivery of fertilizer product, and pay United Suppliers' invoice." MF Statement of Facts at ¶ 33. Laufenberg testified that in these transactions, "after the down payment was made, United Suppliers would have given Millard Feed the release number" and Millard Feed would take possession of the product.[17] MF App'x at 74. Laufenberg explained that after Millard Feed made a down payment in this type of transaction, United Suppliers had the next obligation to give Millard Feed Release numbers. *Id.* at 75. Under a downpay contract, Laufenberg testified that Millard Feed had no further obligations under the agreement unless and until United Suppliers provided a release number.

### F. Tender of Release Numbers

Millard Feed contends that "[p]ursuant to longstanding practice, release numbers or pull tickets would be issued anytime Millard Feed made a purchase from United Suppliers."[18] MF Statement of Facts at ¶ 30. Cook testified that "pull tickets could come any time after the time that, you know, I made a purchase from United Suppliers." MF App'x at 25. He also testified that there were instances where Millard Feed would receive

---

[17] The questioning of Laufenberg on this point was prefaced with this statement: "I'm not talking about prepay contracts, I'm not talking about open purchase contracts, I'm talking about the third kind of transaction whereby you and Mr. Cook on behalf of Millard Feed would agree to a purchase and sale of fertilizer." MF App'x at 72.

[18] United Suppliers disputes this purported fact, and notes that the time of tendering release numbers "would, of course, depend on the type of contract" at issue. US Reply to MF Statement of Facts at ¶ 30. However, United Suppliers acknowledges that, in open type agreements, "pull tickets would arrive right away before payment was made and then be invoiced." *Id.*

pull tickets prior to making any payments. In such instances, Cook testified that United Suppliers "would just invoice [Millard Feed] for what [product] was picked up . . . and then [a Millard Feed employee] would match that up to a receiving, showing that we had received the product, and the invoice should be paid." *Id.*

Michelle Shilts, a Millard Feed employee, was questioned regarding prepay contracts and the tender of release numbers:

> Q.  Are you telling me that sometimes in a contract like [the Subject Contracts], United Suppliers would send a pull ticket after the initial payment but before the balance due?
>
> A.  That's my experience, and as I said, it varied by vendor.

MF App'x at 78.

Millard Feed also contends that "[s]ometimes Cook would receive United Suppliers' release numbers before he received or signed the contract with United Suppliers. This was a 'common practice.'" MF Statement of Facts at ¶ 32. However, Cook's testimony on this point was equivocal:

> Q.  From United Suppliers, not any other vendors, but from United Suppliers, would you get pull tickets before the final balance was due on a contract?
>
> A.  Absolutely. Sometimes I get pull numbers before I ever got any contracts.
>
> Q.  From United Suppliers, correct?
>
> A.  Yes. I believe so. I—Yeah. I would say, yeah, probably so.
>
> Q.  I'm sorry?
>
> A.  I don't know. I don't know if it would be United Suppliers necessarily, but let's put it this way, it's common practice, how is that?
>
> Q.  And I appreciate that answer very much. You clearly

18

have spent a lot of time in the industry and know what different vendors do, as I hope you can appreciate in talking just about Millard Feed's relationship with United Suppliers, didn't United Suppliers ever provide Millard Feed pull tickets before the final balance was paid on any contract?

A.   I would say probably so.  I would believe so.  How is that?

Q.   Can you say definitely so?

A.   No, I can't say definitely so.

Q.   Can you provide a specific contract in which United Suppliers provided pull tickets before the final balance was due?

A.   Not without doing some research.

Q.   All right.  And as a corollary question, but can you provide any pull ticket, can identify or provide any pull tickets that you received before the final payment was due on any prior contract with United Suppliers?

A.   Again, it would be the same answer.

Q.   You would have to do some research?

A.   Uh-hum.  Yes.  I would have to do research.

MF App'x at 18-20.  With respect to the "pull periods" stated in the Subject Contracts, Cook testified as follows:

Q.   And what does [pull period] mean in one of these contracts?

A.   That means that would be the time the product would be available for pick-up.

Q.   And that's the time when you would expect pull tickets to arrive at Millard Feed from United Suppliers?

A.   Usually prior to that.

*Id.* at 23-24.

## G. The "Cancellation" or Adjustment of Contracts

Millard Feed contends that "United Suppliers sometimes cancelled contracts with Millard Feed when fertilizer product was not delivered by the end of the stated 'pull period.'" MF Statement of Facts at ¶ 35. However, the evidence Millard Feed cites does not support this entire proposition. Although he was unable to provide a percentage, Cook testified that "several" contracts with United Suppliers had been cancelled in the past.[19] MF App'x at 21. However, Millard Feed's cited evidence does not support the proposition that United Suppliers cancelled contracts "when fertilizer product was not delivered by the end of the stated 'pull period.'" MF Statement of Facts at ¶ 35.

When United Suppliers cancelled a contract with Millard Feed, United Suppliers would give Millard Feed a refund or credit to its account. Laufenberg testified that some contracts with Millard Feed were cancelled when Millard Feed "underpulled" the contract. US Supp. App'x at 23. Laufenberg explained these transactions as follows:

> Well, when you complete a contract, you know—[t]here are so many ton on a contract and you may pull—[f]or instance, you do a 200-ton contract, usually you figure it's going to be 25-ton loads. So that would be eight loads.

> Sometimes a truck pulls 21, 22-ton, and there would be a balance of seven, eight ton left off of the 200-ton contract after all of the pull loads, the load numbers or whatever have been pulled, and there would maybe be a little left over—a little tonnage left over on that contract that wasn't pulled, so there would be some money that would be left in that contract.

> I can't recall these [specific transactions], but I'm just guessing that that was the case, and [Cook] was buying other material on open loads that were over and above the contract tons for maybe some different materials, and he was able to apply and

---

[19] Millard Feed also cites Laufenberg's deposition to support this proposition. However, the cited portion has nothing to do with "cancelled" contracts. *See* MF Supp. App'x at 21 (page 78 of Laufenberg's deposition transcript).

> he had permission or whatever at that time to apply the balance
> that he did not pull of that contract and apply it to some other
> invoices.  That's what I'm guessing is on those.

*Id.*

Carstens testified similarly regarding "cancelled" contracts.  *Id.* at 10.  Carstens explained that "[t]he contracts are set up on 25-ton truckloads, and for—sometimes the truckload doesn't have exactly that amount on there."  *Id.*  Thus, for example, if Millard Feed pulled 99 tons on a 100 ton contract, "[i]nstead of making [Cook] come back for the one ton and have the same amount of freight for one ton, [United Suppliers] just credited him back one ton . . . ."  *Id.*

Cook avers that "[d]uring the history of [his] business dealings [with Laufenberg], it was not unusual for Laufenberg to work with [Cook] when situations such as a change in the market arose, including [Laufenberg's] willingness to make adjustments to the price of product in [their] purchase agreements, or cancel contracts."  MF App'x at 89.  However, Cook's averment does not differentiate between his dealings with Laufenberg as a representative of Quad States or United Suppliers.

Cook testified that other Millard Feed suppliers had cancelled or adjusted contracts based on market changes:

> Q.  And what do you mean?  What have you done in the
>      past?
>
> A.  Possibly cancelled contracts.
>
> Q.  Uh-hum.  Adjusted contracts downward?
>
> A.  I have with other companies, yeah.
>
> Q.  Has United Suppliers or any other company asked to
>      adjust their prices upward based on the fairness of the
>      market if you got like a really good deal?
>
> A.  I have had—I have had companies cancel contracts, yes,
>      turn things around in the other direction.

21

*Id.* at 17-18.  Regarding his dealings with Laufenberg, Cook testified:

> Q.    In the whole period of time you have done business with Dave Laufenberg, how many times would you ask him to adjust a price down?
>
> A.    I don't know.  Three, four, five.  I don't know.
>
> Q.    And what happened those other times?
>
> A.    A lot of times they just cancelled out the contracts.

*Id.* at 27.[20]

Cook also testified about United Suppliers making price adjustments to contracts with Millard Feed.  When asked whether it would be "unusual" to adjust contracts with United Suppliers in terms of pricing, Cook testified "I would think not, no."  *Id.* at 22.

## H.  Parties' Performance Under the Subject Contracts

After the parties executed the Subject Contracts, United Suppliers purchased the fertilizer product from its suppliers.  Carstens testified that when a United Suppliers sales person enters an order "in the system," the order is sent to United Suppliers' Eldora offices.  US App'x at 22.  There, the procurement department would "buy it from the supplier" unless United Suppliers already had the product "sitting there waiting to be sold[.]"  *Id.*  Carstens testified that United Suppliers "paid its own suppliers to make sure United Suppliers could meet its own obligations under the [S]ubject [C]ontracts and supply the product" to Millard Feed.  *Id.* at 30.

Millard Feed made the initial payment that each of the Subject Contracts required.  United Suppliers did not provide Millard Feed with release numbers or otherwise make the fertilizer available to Millard Feed.  Cook testified that he believed United Suppliers'

---

[20] As made clear by the initial question on this point, Cook's testimony about price adjustments and cancellations was in reference to "the whole period of time" he has done business with Laufenberg.  MF App'x at 27.  Thus, Millard Feed's contention that "[i]n some instances after Cook would make such a request, United Suppliers would cancel the contract,"  MF Statement of Facts at ¶ 58, is not entirely accurate.

failure to provide release numbers meant that "for one reason or another, the [Subject] [C]ontracts were cancelled." MF App'x at 18. Millard Feed failed to pay the balance allegedly due under the Subject Contracts. Millard Feed had no reason to contact United Suppliers about the status or availability of product under the Subject Contracts because United Suppliers always notified Millard Feed if and when product became available. Millard Feed eventually purchased product from other suppliers.

According to Millard Feed, "[t]he Subject Contracts do not accurately reflect the agreement Cook thought he had reached with Laufenberg." MF Statement of Facts at ¶ 42. Cook testified regarding his belief that the Subject Contracts do not include all the terms of the agreement he reached with Laufenberg:

> Q.  What terms, if you know, of the contract weren't written down in each of the contracts?
>
> A.  To me the fact that there was only 25 percent down, I guess, on these contracts.
>
> Q.  So you believe there was an understanding that whatever was remaining would be worked out later?
>
> A.  Yes, we have done it in the past.

MF App'x at 17.

### I.  Form Contract Changes

In 2008, United Suppliers changed certain standard contract terms in its form prepay contracts. Among the changes, United Suppliers added a provision for United Suppliers' recovery of expenses and attorneys' fees incurred to collect payments, and it eliminated United Suppliers' obligation to pay interest on refunded payments.

Laufenberg first learned of these contract language changes at his deposition in this action. Nobody at United Suppliers told Laufenberg that it was changing the terms of the

form contracts.[21]

## J. Decline in the Fertilizer Market

According to United Suppliers, the market for the fertilizer products covered by the Subject Contracts "dropped precipitously" in the fall of 2008. United Suppliers' Brief in Support of the Motion ("US Br.") (docket no. 35-3) at 3-4. Cook testified that between July and December of 2008, "[t]he market probably fell 30 percent." MF App'x at 26.

## K. Cook's Discussions with United Suppliers Representatives

As early as September or October of 2008, Cook asked United Suppliers to cancel the Subject Contracts and offered, "in at least one conversation, to allow United Suppliers to keep the prepayment amounts in exchange for cancellation." US Statement of Facts at ¶ 19. Laufenberg recalls a telephone conversation in which Cook directed Laufenberg to "ask [United Suppliers] if there was going to be any sort of adjustments on these contracts . . . ." US App'x at 34. Laufenberg testified that he told Cook he did not think any adjustments would be made. After speaking with another United Suppliers employee, Laufenberg testified that he "called [Cook] and said it doesn't look like at this point in time that there is anything going to be done as far as adjustments." *Id.* at 35.

Laufenberg also recalls a conversation, in November or December of 2008, in

---

[21] Millard Feed notes some confusion during discovery as to whether one of the Subject Contracts, No. 81299, contains the attorneys' fees and expenses provision. Millard Feed goes on to state "it is unclear whether the Subject Contracts attached to United Suppliers['] summary judgment motion in this action are accurate copies of the originals." MF Statement of Facts at ¶ 46. However, Millard Feed does not directly dispute that the documents set forth at United Suppliers' Exhibits A through D are authentic copies of the Subject Contracts. In fact, with respect to the contract at issue, Millard Feed states that it is "[u]ndisputed that Millard Feed's president signed a sales contract document, identified as No. 81299, a copy of which appears as Exhibit A at [United Suppliers'] Appendix." Millard Feed's Response to United Suppliers' Statement of Material Facts ("MF Response") (docket no. 40-1) at ¶ 1. Accordingly, any confusion during discovery is immaterial to the Motion.

which Cook proposed that United Suppliers keep Millard Feed's initial payments and he would buy cheaper fertilizer elsewhere. Laufenberg told Cook that United Suppliers would "probably not be happy and probably take legal action." *Id.* at 36.

After Laufenberg's October 2008 retirement, Randy Vollrath took over the Millard Feed account in January 2009. On February 3, 2009, Vollrath met with Cook at Millard Feed. Vollrath testified that, "within the first couple minutes [Cook] said 'We've got to do something about those contracts.'"[22] *Id.* at 64.

When asked whether he initiated any communication with United Suppliers in the Spring of 2009, Cook testified as follows:

> Q.     [D]id you provide a letter or an e-mail or a phone call
>        to United Suppliers saying: . . . I consider [the Subject
>        Contracts] cancelled because you didn't send any pull
>        tickets?
>
> A.     No.
>
> Q.     How about any communication, e-mail or letters to

---

[22] According to United Suppliers, Vollrath and Cook had a phone conference on March 19, 2009. During this phone conference, Vollrath recollects that "Cook requested that terms of the [S]ubject [C]ontracts be adjusted and perhaps . . . be cancelled in return for keeping a percentage of the original tons." US Supp. App'x at 114. Vollrath testified that United Suppliers offered to "buy[] back the contracts at the market price" but Millard Feed would still owe the balance. US App'x at 66. Vollrath testified that Cook told him that was "not going to work[.]" *Id.* Millard Feed argues that the facts regarding the March 19, 2009 phone conference "are immaterial and inadmissible settlement discussions." MF Response at ¶ 21. Further, Millard Feed contends that "[a]fter Cook's February 2009 conversation with . . . Vollrath, no one from United Suppliers made any attempt to communicate with Cook about the Subject Contracts until [Cook] received a demand letter from United Suppliers' law firm in June 2009." MF Statement of Facts at ¶ 48. The court need not address these issues because they are immaterial. Specifically, whether the March 19 phone conference took place would not alter the court's resolution of the Motion because the terms of the Subject Contracts and the remainder of the parties' course of performance make clear that Millard Feed breached its obligations under the Subject Contracts.

United Suppliers clarifying or requesting what was
going to happen with the prepayments?

A.     Not to my knowledge.

MF Supp. App'x at 2.

### L.  United Suppliers' Collection Efforts

On February 20, 2009, United Suppliers' accounting clerk Suzanne Krause sent a
letter to Millard Feed regarding three of the Subject Contracts.  The letter states, in part:

> To Accounts Payable:
>
> This letter is to serve as a courtesy reminder that there is a
> contract payment coming due.
>
> According to our records, we show that a payment of $37,200
> is due 3/1/2009 on contract 81348.  We also show that a
> payment of $531,375 is due 3/1/2009 on contract 81424 and
> a payment of $153,750 is due 3/1/2009 on contract 81299.  If
> payment has been sent please disregard this notice and thank
> you for your prompt payment.  If you feel you have received
> this in error, please contact your local Territory Manager.

US App'x at 12.  Millard Feed acknowledges it received Krause's letter.  However, it
disputes that Cook himself received the letter.

Millard Feed's business records also include a "Statement of Fertilizer Contracts"
("Statement") from United Suppliers.  *Id.* at 15.  The Statement bears a date of "6/3/2009"
and Krause avers that the Statement "would have been sent to Millard Feed on or about
June 3, 2009."  *Id.* at 13, 15.  The Statement lists the Subject Contracts and reflects that
Millard Feed had paid nothing beyond the initial payment that the Subject Contracts
required.

On June 22, 2009, United Suppliers, through its counsel, sent a demand letter to
Millard Feed for the balance allegedly due under the Subject Contracts.  The demand letter
stated, in part:

> It is our understanding that the initial payments that were due

under the [Subject] [C]ontracts were paid, but that the remaining payments that were due either January 15, 2009 or March 1, 2009 were not made and that the contracts are now in default.

*Id.* at 10. United Suppliers demanded payment of $1,036,168.96 within ten days. This amount consisted of the $992,325 allegedly due under the Subject Contracts, interest through June 17, 2009 and storage fees on an apparently unrelated contract.

Cook testified that during a June 2009 conversation with a Millard Feed employee, he learned that United Suppliers would not be crediting or refunding his initial down payments under the Subject Contracts.

### M. United Suppliers' Mitigation Efforts

United Suppliers contends that it reduced its alleged principal damages by $530,094.62 through resale and, in the case of one contract,[23] credit from a supplier. Thus, United Suppliers seeks principal damages of $462,230.38. United Suppliers offers a mitigation table, *see* US App'x at 58, which Carstens testified "represents the damages [United Suppliers] financially has received from Millard [Feed] not pulling their contracts and paying for the rest of it." *Id.* at 25. Carstens testified that three transactions occurred in September of 2009 and the remaining resale took place in November of 2009.[24] The mitigation table also reflects that United Suppliers gave Millard Feed credit for its initial payments under the Subject Contracts.

Through resale, United Suppliers recovered approximately 40% of the balance allegedly owed on Contract No. 81348, approximately 36% of the balance allegedly owed

---

[23] Contract No. 81299.

[24] Carstens testified that in September of 2009, United Suppliers resold the product in Contract Nos. 81348 and 81424 and received a credit on Contract No. 81299. Carstens testified that in November of 2009, United Suppliers resold the product in Contract No. 81425.

on Contract No. 81424 and approximately 44% of the balance allegedly owed on Contract No. 81425. *See* US App'x at 58. Through a credit from its supplier, in conjunction with Millard Feed's initial payment, United Suppliers was able to recover $46,250 more than the balance allegedly owed on Contract No. 81299.

Between June of 2009, when the Subject Contracts expired, and September of 2009, the market price for the fertilizer product dropped "by hundreds of dollars per ton." MF Statement of Facts at ¶ 65. Carstens testified that in July of 2009, "nobody wanted to buy." US App'x at 27. He explained that "[e]verybody could see the price was falling. They were waiting, about September, October. Then the bottom hit in November, then we started to have opportunities to sell again, but the industry went into a complete standstill." *Id*. Carstens testified that the market "stayed in a low slump for a long period of time" and did not see "strong upticks" until 2010. *Id*. at 28. He also explained that United Suppliers was "taking major hits financially on what was going on, and [the Subject Contracts] [were] the only contracts that [United Suppliers] had that were not going well." *Id*. According to Carstens, United Suppliers was "trying to work things out" and "tried to give [Cook] every benefit of the doubt." *Id*.

Carstens testified that there was not a "similar market effect" on Contract No. 81299 because, unlike the other contracts, Contract No. 81299 involved ammonia. *Id*. at 27. Carstens explained that "[y]ou can't have [ammonia] sitting [in a pipeline], waiting and waiting and waiting. It has to move." *Id*. Carstens testified that United Suppliers contacted its supplier, Agrium, "saying, we don't have anywhere to go, the guy won't give us his money. They said, no problem, we need it back." *Id*.

## VII. ANALYSIS

### A. Applicable Law

The Subject Contracts do not contain forum selection or choice of law provisions. A "district court sitting in diversity applies the law, including the choice-of-law rules, of

the state in which it sits." *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007). "Before applying the forum state's choice-of-law rules, however, a trial court must first determine whether a conflict exists." *Id*; *see also Phillips v. Marist Soc. of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) ("'[B]efore entangling itself in messy issues of conflict of laws[,] a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.'" (quoting *Barron v. Ford Motor Co. of Can., Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992))).

United Suppliers' claims, which are based on the sale of fertilizer products, are governed by the Uniform Commercial Code ("UCC"). *See* Iowa Code § 554.2102 (stating that the UCC applies to "transactions in goods"). Both Iowa and Wisconsin have adopted the UCC. *See* Iowa Code § 554.1101; Wis. Stat. § 401.101. Further, to the extent they are applicable, relevant principles of contract law are the same in both jurisdictions.[25] *See Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (breach of contract requires proof of a contract, its terms, the aggrieved party's performance, breach and damages); *Loth v. City of Milwaukee*, 758 N.W.2d 766, 768 (Wis. 2008) (breach of contract requires proof of a contract, its terms and breach). Thus, the court need not conduct a choice-of-law analysis. *See Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 613 (9th Cir. 1975), *cited with approval in Phillips*, 80 F.3d at 276, ("In the absence of a true conflict, *lex fori* controls.")[26]

### B. Parties' Arguments

For clarity's sake, the court briefly summarizes the parties' principal arguments.

---

[25] Iowa's UCC provides that "[u]nless displaced by the particular provisions of this chapter, the principles of law and equity . . . supplement its provisions." Iowa Code § 554.1103(2); *see also Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 578 (Iowa Ct. App. 2001) ("Article 2 does not, of course, entirely eliminate the common law of contracts.") (citing Iowa Code § 554.1103).

[26] The parties appear to agree that Iowa law controls.

29

### 1. United Suppliers' arguments

United Suppliers' claim is straightforward: the parties entered into four prepay contracts and, while it made the required initial payment on each contract, Millard Feed breached the Subject Contracts by failing to pay the balance by the due date set forth in each contract. United Suppliers argues that the Subject Contracts unambiguously require Millard Feed to pay the balance due prior to receiving the fertilizer and that the unambiguous language of the Subject Contracts trumps any perceived course of dealing issues Millard Feed raises.

In the Motion, United Suppliers seeks summary judgment on its breach of contract claim and an award of $462,230.38, the amount it claims remains outstanding after it mitigated its damages. United Suppliers also seeks interest at 1% per month, as stated in the Subject Contracts, as well as costs and attorneys' fees. Finally, United Suppliers seeks summary judgment with respect to each of Millard Feed's affirmative defenses and its Counterclaim for down payments.

### 2. Millard Feed's arguments

In its Resistance, Millard Feed raises four points. Millard Feed contends that genuine issues of fact exist as to: (1) whether, in light of the parties' course of dealing and usage of trade, United Suppliers cancelled or breached the Subject Contracts; (2) whether the Subject Contracts reflect the parties' actual agreement; (3) whether United Suppliers breached a fiduciary duty owed to Millard Feed; and (4) the amount of United Suppliers' damages.

## C. Analysis

### 1. United Suppliers' cancellation or breach of the Subject Contracts

Millard Feed argues that course of dealing and usage of trade evidence raises a genuine issue of material fact as to whether United Suppliers cancelled or breached the Subject Contracts. Millard Feed contends that, after United Suppliers refused to

"renegotiate" the Subject Contracts, Cook believed, "based upon his past course of dealing with Laufenberg, that United Suppliers was opting to cancel the Subject Contracts." Resistance at 6. Similarly, Millard Feed argues that United Suppliers' failed to tender delivery of the product by failing to provide Millard Feed release numbers. Millard Feed submits that United Suppliers' failure to deliver the product constituted a breach of the Subject Contracts and was otherwise "consistent with cancelling the contracts under the parties' prior course of dealings." *Id.*

United Suppliers argues that Millard Feed's course of dealing argument is immaterial for several reasons. According to United Suppliers, most—if not all—of Millard Feed's supposed course of dealing evidence is irrelevant because it relates to past transactions involving contracts different than the prepay contracts at issue here. United Suppliers argues that "applying terms or performance under other, past contracts of different types or contracts between other parties in the industry would so confuse the terms of the [Subject Contracts] as to make them incoherent and unreliable." US Br. at 18. Even assuming that it had, in the past, tendered product under a "prepay" contract before final payment or amended contract terms due to market changes, United Suppliers contends this is of no consequence because United Suppliers' actions in this case "were completely consistent with the terms of the [S]ubject [C]ontracts and it had every right to hold Millard Feed to its promises." *Id.* at 19.

The court rejects Millard Feed's course of dealing argument. The court agrees with United Suppliers that a substantial majority of Millard Feed's purportedly disputed facts are simply immaterial to this case. Much of Millard Feed's course of dealing argument and evidence pertains to Millard Feed's dealings with Quad States, rather than United Suppliers. Despite Millard Feed's insistence that there was no published announcement of Quad States' merger with United Suppliers, it never argues that Cook—or anyone else at Millard Feed—believed he was dealing with an entity other United Suppliers in the

transactions underlying this suit. Any course of dealing established during the three years that Millard Feed did business with Quad States is simply immaterial to the Subject Contracts. *See* Iowa Code § 554.1303(2) (defining "course of dealing" as "a sequence of conduct concerning previous transactions *between the parties* to a particular transaction" (emphasis added)). Thus, the court concludes that any course of dealing established between Millard Feed and Quad States is immaterial to the parties' obligations or performance under the Subject Contracts.

Millard Feed's course of dealing argument also lacks merit with respect to those dealings between Millard Feed and United Suppliers. Notably, nearly all of the purported evidence of United Suppliers' alleged breach or cancellation of the Subject Contracts relates to transactions different than the prepay contracts at issue here. For example, Millard Feed makes much of the fact that United Suppliers would, in some transactions, provide release numbers prior to Millard Feed making payment. However, the record makes clear that this practice was entirely consistent with the parties' obligations in open load or open purchase agreements. Laufenberg testified that in these transactions, United Suppliers would provide release numbers, and Millard Feed would make payment after picking up the product. Similarly, Laufenberg testified that in downpay transactions, United Suppliers would provide release numbers after Millard Feed made a down payment. These facts are consistent with Millard Feed's contention that "Millard Feed's duty to complete a purchase of fertilizer was, in many transactions, triggered by the seller's . . . tender of release numbers." MF Statement of Facts at ¶ 28. To the extent they are based on transactions other than prepay contracts, Millard Feed's purported facts regarding the tender of release numbers are immaterial because the prior conduct cannot fairly "be regarded as establishing a common basis of understanding for interpreting [the parties'] expressions and other conduct." Iowa Code § 554.1303(2). Thus, the court concludes that any course of dealing Millard Feed and United Suppliers established with respect to open

load or downpay transactions is immaterial to the parties' obligations or performance under the Subject Contracts.

With respect to United Suppliers' alleged cancellation of the Subject Contracts, the court concludes that Millard Feed's arguments are without merit. Despite Millard Feed's contention that United Suppliers cancelled contracts "when fertilizer product was not delivered by the end of the stated 'pull period,'" MF Statement of Facts at ¶ 35, it sets forth no evidence to support this assertion. Although Cook testified that United Suppliers cancelled "several" contracts in the past, MF App'x at 21, his testimony does not specify whether these were open load, downpay or prepay contracts. Millard Feed has not identified any prepay contracts that United Suppliers cancelled for this reason. Cook's testimony also does not elaborate when and in what circumstances United Suppliers cancelled contracts. The only relevant evidence shows that contracts were cancelled not because the product was not delivered by the end of the pull period, but because Millard Feed "underpulled" on a contract. US Supp. App'x at 23. Carstens and Laufenberg both testified that United Suppliers would cancel the contract and give Millard Feed a refund or credit in these circumstances, rather than requiring Millard Feed to send another truck to pick up the remaining product. Millard Feed fails to set forth any evidence that the parties established a course of dealing in which United Suppliers would cancel contracts in transactions or circumstances similar to the Subject Contracts. Accordingly, Millard Feed has failed to establish a genuine issue for trial on this point.

Millard Feed contends, relying on Shilts' testimony, that "United Suppliers sometimes sent out release numbers . . . after Millard Feed made an initial down payment on a 'pre pay' form contract, before the balance of the contract payment was due." Resistance at 5. Shilts was asked whether, "in a contract like [one of the Subject Contracts], United Suppliers would send a pull ticket after the initial payment but before the balance due?" MF App'x at 78. Shilts responded that was her "experience" but noted

that it "varied by vendor." *Id.* Even ignoring the equivocal nature of Shilts' testimony, the record—including Cook's own testimony—establishes the absence of a genuine issue as to whether the parties established a course of dealing in which United Suppliers provided release numbers to Millard Feed prior to the final payment on a prepay contract.

Laufenberg testified that United Suppliers would not tender release numbers in a prepay contract until "after the contract was paid." US Supp. App'x at 20. Carstens testified that United Suppliers has never, under any prepay contract, given Millard Feed release numbers "before Millard Feed paid the full price under the contract[.]" *Id.* at 15. Cook testified that he could not "definitely" say that United Suppliers had ever provided release numbers before the final balance was due on any contract. MF App'x at 19. He was also unable to identify "a specific contract in which United Suppliers provided pull tickets before the final balance was due[.]" *Id.* The court concludes that a reasonable jury could not find that the parties established a course of dealing in which United Suppliers gave Millard Feed release numbers prior to Millard Feed paying the balance due on a prepay contract. Thus, Millard Feed's purported reliance on the lack of release numbers as an indication that United Suppliers cancelled the Subject Contracts is unavailing.

Finally, and perhaps most importantly, Millard Feed's course of dealing and usage of trade evidence is simply inconsistent with the express terms of the Subject Contracts. The Subject Contracts state that they are "Prepay" contracts. US App'x at 1, 3, 5 & 7. They each call for an initial payment, with the "BALANCE DUE" on a specific date several months later. *Id.* Finally, the Subject Contracts all specify a "PULL" period of three or four months, with the earliest being March of 2009. *Id.* United Suppliers' position—that it had no duty to tender release numbers until Millard Feed paid the balance due—is consistent with the plain terms of the Subject Contracts. In addition to being designated as prepay contracts, the pull period set forth in each contract falls some time after the date by which Millard Feed had to pay the balance due. Thus, the "prepay"

nature of the Subject Contracts is confirmed by the fact that Millard Feed could not pull the product until after it paid the balance due. Carstens explained as much when he testified:

> [Millard Feed] could not pull this product until March, April, May or June of '09. You see that in the last box, which is why the final payment is due on March 1st, so when the payment is received at or before the pull period begins.

US App'x at 24.

Millard Feed's contention that United Suppliers breached the Subject Contracts by failing to deliver product to Millard Feed is without merit. Millard Feed relies on Iowa Code section 554.2507, which provides that "[t]ender of delivery is a condition . . . to the buyer's duty to pay for [the goods]." Iowa Code § 554.2507(1). However, the statute provides that this rule applies "unless otherwise agreed." *Id.* The commentary states that "[t]he 'unless otherwise agreed' provision of subsection (1) is directed primarily to cases in which payment in advance has been promised . . . ." *Id.* cmt. 2. This is such a case. *See* US App'x at 1, 3, 5 & 7 (stating that each Subject Contract is a "Prepay" contract).

The court agrees with United Suppliers that it "did not fail to do anything, rather it was *not required* to tender the product under the [S]ubject [C]ontracts *until* the balances were paid *before* the pull periods began." US Br. at 16. Any course of dealing or trade usage that contradicts the express terms of the Subject Contracts must give way. *See* Iowa Code § 554.2202 (stating the terms of a written contract "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement"); *see also C-Thru Container Corp v. Midland Mfg. Co.*, 533 N.W.2d 542, 545 (Iowa 1995) ("[E]ven a completely integrated contract may be supplemented by practices in the industry *that do not contradict express terms* of the contract." (emphasis added)). Because Millard Feed's argument that United Suppliers breached the Subject Contracts is based on contentions that contradict the express language of the contracts, the court finds they are without merit.

35

*See* Iowa Code § 554.1303(5) (stating that if construing express terms along with course of performance, course of dealing and usage of trade leads to an unreasonable result, express terms and course of performance prevail).[27]

### 2. The parties' "actual" agreement

Millard Feed also contends that reformation of the Subject Contracts is appropriate because they "do not correctly embody the parties' prior course of dealings and usage of trade practices." Resistance at 9. Similarly, Millard Feed argues that purported "boilerplate" language on the back of the Subject Contracts, including the attorneys' fees provision, is not part of the parties' agreement. *Id.* at 10.

"When the understanding of the parties was not correctly expressed in the written contract, equity exists to reform the contract to properly express the intent of the parties." *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 151 (Iowa 2001). "[I]t normally makes no difference if the mistake is mutual or unilateral." *Id.* "This is because the operative mistake is the belief of the parties that the contract correctly expresses the agreement." *Id.* "The party who contends an agreement does not reflect the real intention of the parties must prove this contention by clear, satisfactory, and convincing evidence." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 636 (Iowa 1996).

Millard Feed contends "[t]here is evidence that the Subject Contracts did not reflect the 'course of conduct' and 'usage of trade['] practices Laufenberg and Cook regularly observed." Resistance at 10. According to Millard Feed, "[t]he exact terms of any one agreement were flexible." *Id.* Millard Feed asserts that "Cook could reasonably expect

---

[27] The court notes also that the parties' course of performance, including Millard Feed's payment of the initial payment, United Suppliers' insistence that Millard Feed pay the balance due and Millard Feed's failure to ever demand the product, is consistent with the express terms of the Subject Contracts. Express terms and course of performance prevail over course of dealing and usage of trade. Iowa Code § 554.1303(5).

that whatever deal he and Laufenberg struck orally would be honored."[28]  *Id.* at 9.

Much of the evidence Millard Feed offers in support of this argument relates to Millard Feed's dealings with Quad States. For the reasons stated in Section VI.C.1, *supra*, this evidence is immaterial to the parties' intentions underlying the Subject Contracts. In any event, the court concludes there is no genuine issue of material fact as to whether the Subject Contracts reflect the parties' intent. No evidence, other than Cook's subjective hopes or beliefs that United Suppliers would cancel, adjust or otherwise modify the Subject Contracts, suggests that the parties intended anything other than what is set forth in the Subject Contracts.

With respect to the so-called "boilerplate" language, including the attorneys' fees provision, the court concludes that these provisions constitute an enforceable part of the parties' agreement. Millard Feed does not dispute that Cook signed each of the Subject Contracts. It also does not dispute that each contract states, on the front page in bold type, that the contract would be "**GOVERNED BY THE TERMS AND CONDITIONS APPEARING ON THE FACE AND REVERSE SIDE**[.]" However, Millard Feed insists that due to the "pattern" established between Laufenberg and Cook, "United Suppliers could have anticipated that Cook would not read the boilerplate language." Resistance at 12.

As the Iowa Supreme Court explained:

> "Failure to read a contract before signing it will not, as a rule, affect its binding force. Indeed, the courts appear to be unanimous in holding that a person who, having the capacity and an opportunity to read a contract, is not misled as to its contents and who sustains no confidential relationship to the other party cannot avoid the contract on the ground of mistake

---

[28] Despite this assertion, Millard Feed never describes what "deal" Cook believes he actually reached with United Suppliers or specifies how that deal differs from the terms of the Subject Contracts.

> if he signs it without reading it, at least in the absence of
> special circumstances excusing his failure to read it."

*Bryant v. Am. Express Fin. Advisors, Inc.*, 595 N.W.2d 482, 486-87 (Iowa 1999) (quoting 17A Am.Jur.2d *Contracts* § 225, at 229-30 (1991)); *see also Advance Elevator Co., Inc. v. Four State Supply Co.*, 572 N.W.2d 186, 188 (Iowa Ct. App. 1997) ("[A] party is charged with notice of the terms and conditions of a contract if the party is able or has had the opportunity to read the agreement. A party is also bound by a document the party signs even though the party has not expressly accepted all of the contract provisions and is not aware of them." (citations omitted)).

Millard Feed offers no persuasive reason to allow it to avoid the express terms of the Subject Contracts. Cook had the capacity and opportunity to read the Subject Contracts, and United Suppliers did not mislead him as to their contents. To the contrary, United Suppliers gave Millard Feed clear notice, on the front of each contract, that it would be bound by the terms appearing on the back of the Subject Contracts. Further, there is no confidential relationship or other "special circumstances" to excuse Cook's apparent failure to read the terms on the reverse side of the Subject Contracts. *Bryant*, 595 N.W.2d at 487. For largely the same reasons explained below, regarding the lack of a fiduciary relationship, the parties did not stand in a confidential relationship.

Millard Feed contends that "[a] contract may be reformed when one party had the faith and confidence of the other party, and uses that position to insert terms in a writing without disclosure to the other party." Resistance at 8. Millard Feed relies on a 1937 case, *Conrad v. Farmers Mut. Hail Ins. Ass'n of Iowa*, 273 N.W. 913 (Iowa 1937). In *Conrad*, the Iowa Supreme Court affirmed the reformation of an insurance settlement contract that purported to cancel a farmer's crop insurance. *Id.* at 917-18. The court found that at the time the oral settlement was reached, no one other than one of the adjusters "knew anything about, or had anything to do with, the matter of inserting in pencil the statement, 'assessment to date, policy cancelled this day.'" *Id.* at 915.

Accordingly, "through a mutual mistake, the written instrument signed d[id] not embody the actual agreement of the parties." *Id.* at 916.

The insurer argued that the farmer was estopped from seeking reformation because he was negligent in failing to read the contract. The court reasoned that estoppel did not apply because both parties were mistaken as to the contents of the contract. *Id.* at 916. The court also noted that the farmer "placed great faith and confidence in" the adjuster and "the insured ordinarily relies upon the agent to properly set out in the application the facts given him." *Id.* The adjuster who inserted the cancellation language, as well other representatives of the insurer, had knowledge of the farmer's confidence in them. *Id.* at 917. Further, the adjuster conceded that "he heard no talk of cancellation of the policy in any of the negotiations" until he "approached [the farmer] for his signature, stating to [the farmer] that it was necessary that he execute a 'proof of loss.'" *Id.* Finally, the adjuster approached the farmer for his signature "on a busy day of threshing at the Conrad farm," and made no mention of cancellation. *Id.* In fact, the adjuster's conduct rose "very nearly, if not wholly, to the point of constructive fraud." *Id.*

The distinctions between the facts of *Conrad* and the instant action speak for themselves. Cook had the opportunity to read the Subject Contracts, each of which expressly stated Millard Feed was bound by the terms on the reverse side. There is no evidence of anything approaching fraud on the part of United Suppliers.[29] Thus, even if Millard Feed is correct that the Subject Contracts differ from the parties' "actual" agreement—a contention not borne out by the record—the court concludes there is no basis for reforming the Subject Contracts.

_____

[29] Millard Feed asserts that "United Suppliers slipped in new provisions on the back of the form, admittedly without any notice to Millard Feed." Resistance at 12. Notice to Millard Feed appears on the face of each contract.

### 3.     *Breach of fiduciary duty*

Millard Feed contends that United Suppliers breached a fiduciary duty it owed to Millard Feed by: (1) "fail[ing] to honor the tenor of Laufenberg's established relationship with Millard Feed by either adjusting or cancelling the Subject Contracts when unexpected market conditions arose" and (2) failing to disclose to Millard Feed that United Suppliers "was putting additional terms into the Subject Contracts." Resistance at 14-15.  United Suppliers argues that it owed no fiduciary duty to Millard Feed.  Rather, United Suppliers contends that the Subject Contracts "are the result of an arms-length negotiation between sophisticated, experienced agribusinesses." Reply at 4.

"'A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986) (quoting Restatement (Second) of Torts § 874 cmt. a).  Some relationships, such as attorney-client and principal-agent, "necessarily give rise to a fiduciary relationship." *Kurth*, 380 N.W.2d at 696. However, "[b]ecause the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Id.*  Indicia of a fiduciary relationship include:

> the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.

*Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 52 (Iowa 2003).

Millard Feed begins by noting that United Suppliers is a cooperative and Millard Feed is one of its member-owners.  It proceeds to argue that "Laufenberg, acting with apparent knowledge, experience, and information in the industry, built a relationship of trust and confidence with Cook." Resistance at 14.  This means, according to Millard Feed, that "United Suppliers owed Millard Feed a fiduciary duty." *Id.*  The court

disagrees.

When Laufenberg worked for Quad States, and later United Suppliers, he spoke to Cook about market conditions, pricing, quantities available, shipment and purchase price. It also appears undisputed that Cook trusted and relied upon Laufenberg's knowledge, opinions and advice on the market, pricing and product availability of fertilizer product. Cook also relied on the fact that Laufenberg would work for Cook "to ensure that Cook was able to take advantage of market opportunities." MF Statement of Facts at ¶ 18.

Despite these facts, the court concludes that a reasonable jury could not find that a fiduciary relationship existed between United Suppliers and Millard Feed. Regardless of United Suppliers' status as a cooperative, or Millard Feed's position of member-owner, with respect to the Subject Contracts, the parties came face-to-face simply as buyer and seller. Laufenberg was not acting on behalf of Cook or Millard Feed in negotiating the Subject Contracts. He was acting on behalf of his employer—United Suppliers. Cook was undoubtedly aware of this when he executed contracts to purchase more than $1 million in fertilizer, all of which bore United Suppliers' name.

There is absolutely no evidence to suggest that Laufenberg had or exercised influence or dominance over Cook with respect to what products Millard Feed purchased or what contracts it executed. The evidence also belies any suggestion that Cook was dependent on Laufenberg or that the parties otherwise stood on unequal footing in negotiating the Subject Contracts. Cook holds a bachelor's degree in agronomy. He has worked for Millard Feed for well over two decades and has been its president and sole owner for more than ten years. The fact that Cook and Laufenberg regularly discussed market conditions, pricing, quantities and shipment terms, and that Cook even relied upon Laufenberg's advice, is insufficient, as a matter of law, to create a fiduciary relationship. In fact, it is difficult to imagine how a buyer and seller would ever buy or sell anything without discussing such matters.

Millard Feed relies on *Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 344 F.3d 738 (8th Cir. 2003) and *Top of Iowa Co-op v. Schewe*, 149 F. Supp. 2d 709 (N.D. Iowa 2001). Both cases are readily distinguishable. In contrast to this case, the fiduciary relationship in *Asa-Brandt* "did not arise through a simple buyer/seller relationship." 344 F.3d at 744-45. Rather, the evidence showed that the grain elevator's manager "was more experienced, more sophisticated, and more privy to information" than the plaintiff farmers "about [hedge-to-arrive contracts] and the risks inherent in their use." *Id.* at 744. "The [f]armers also testified that they were encouraged by [the manager] to enter into [hedge-to-arrive contracts], and that they relied upon his advice in executing them." *Id.*

*Schewe*, like *Asa-Brandt*, involved facts that simply are not present here. In *Schewe*, the court sustained a jury's finding of a fiduciary relationship where the defendant's representatives included "an experienced grain merchandiser who engages in daily 'hedging' transactions on the [Chicago Board of Trade]" and an individual who "had been a licensed broker on the [Chicago Board of Trade]." 149 F. Supp. 2d at 718. There was "no evidence that [the plaintiff] engaged in frequent, complex, or sophisticated hedging transactions as a routine part of his marketing strategy." *Id.* Finally, the evidence reflected that the defendant "was receiving more information than [the plaintiff] that should have warned [the defendant] about the increasing volatility of the corn market and the potential risks of inverse spreads if the [hedge-to-arrive contracts] were 'rolled.'" *Id.*

Unlike *Asa-Brandt* and *Schewe*, the transactions at issue in this case did not involve sophisticated or unfamiliar transactions. Rather, the parties regularly entered into contracts similar—if not identical—to the Subject Contracts. It also does not appear that the Subject Contracts involved inordinate or novel risks, much less that Laufenberg encouraged Cook to take any such risks. *Cf. id.* (noting that "the jury could reasonably have concluded that [the plaintiff] was invited and encouraged to enter into the [hedge-to-arrive contracts] in the first place based on the advice of representatives of [the

defendant]"). Finally, this case does not involve unequal parties, whether in terms of sophistication, experience, information or otherwise. *Cf. id.* (noting the parties' contrasting experience in "frequent, complex, or sophisticated hedging transactions"). No fiduciary relationship existed between United Suppliers and Millard Feed. Accordingly, there was no relationship for United Suppliers to breach.

### 4. Damages

When a buyer breaches a sale of goods contract, the seller may "resell and recover damages" as provided in Iowa Code section 554.2706. Iowa Code § 554.2703(4). "Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price . . . ." Iowa Code § 554.2706(1). "The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach." *Id.* at § 554.2706(2).

In the case of a breach, the seller may also "proceed under section 554.2704 respecting goods still unidentified to the contract[.]" *Id.* at § 554.2703(3). Iowa Code section 554.2704, in turn, provides that a seller may "identify to the contract conforming goods not already identified if at the time the seller learned of the breach they are in the seller's possession or control." *Id.* at § 554.2704(1)(a).

Millard Feed attacks United Suppliers' mitigation efforts on four fronts, arguing that: (1) United Suppliers fails to show that it ever identified product to the Subject Contracts; (2) United Suppliers failed to give Millard Feed notice of its intent to resell; (3) the alleged resales were not commercially reasonable; and (4) United Suppliers fails to provide evidence to support its claimed damages. The court addresses each of these issues, in turn.

#### a. Identification of product

Millard Feed's argument that United Suppliers failed to identify product to the

Subject Contracts is without merit. Millard Feed admits that United Suppliers "purchased the fertilizer product from its own suppliers at the time the Subject Contracts were signed . . . in order to meet its obligations under the Subject Contracts with Millard Feed." US Statement of Facts at ¶ 12; MF Response at ¶ 12. Carstens' undisputed testimony supports this fact. These undisputed facts contradict Millard Feed's assertion that there is no evidence that product was "dedicated specifically to the Subject Contracts."[30] Resistance at 16. Further, Millard Feed sets forth no evidence to controvert United Suppliers' mitigation table or Carstens' testimony, both of which support the fact that the resale and credit transactions relate to the product underlying the Subject Contracts. Accordingly, the court concludes that United Suppliers' mitigation efforts were reasonably identified to the Subject Contracts.

Even if the goods were "unidentified to the contract," Iowa Code § 554.2703, United Suppliers still may "identify to the contract conforming goods not already identified if at the time the seller learned of the breach they are in the seller's possession or control." Iowa Code § 554.2704(1)(a). Millard Feed contends that its alleged breach occurred in March 2009, when the final payments were due, and there is "no evidence that United Suppliers had product in its possession or control at those times . . . ." Resistance at 17. However, as noted above, Carstens undisputed testimony shows that United Suppliers acquired the product at the time the parties executed the Subject Contracts. Millard Feed offers nothing other than speculation and immaterial allegations in an attempt to create a genuine issue for trial.[31] The court rejects Millard Feed's argument that United Suppliers

---

[30] The court notes that the statute requires only that the resale be "reasonably identified" as referring to the contract. Iowa Code § 554.2706(2).

[31] For example, Millard Feed points to Vollrath's testimony that he could not, after reviewing United Suppliers' records, tell whether certain sales related to Millard Feed or the product underlying the Subject Contracts. This is immaterial because it was not

(continued…)

failed to identify product to the Subject Contracts.

> **b.** **Notice**

Millard Feed also argues that United Suppliers failed to give Millard Feed notice of its intention to resell. *See* Iowa Code § 554.2706(3) (providing that if the resale is a private sale, "the seller must give the buyer reasonable notification of the seller's intention to resell").[32] The court disagrees. Each of the Subject Contracts provides that if Millard Feed fails to make payment upon demand, United Suppliers has the option of "terminating its obligations hereunder as to any undelivered product, or *reselling such undelivered product in the open market* for [Millard Feed's] account, in which latter event [Millard Feed] shall pay [United Suppliers] the amount of any loss incurred." US App'x at 2, 4, 6 and 8 (emphasis added). The court concludes that this satisfies the notification requirement. Accordingly, no genuine issue of material fact exists as to whether United Suppliers gave notice of its intent to resell.

Additionally, other than noting United Suppliers' alleged failure to give the statutory notice, Millard Feed does not allege what impact the supposed lack of notice had. For example, Millard Feed does not contend that the resale would have brought a higher price or been different in any respect had it gotten notice. Likewise, Millard Feed does not

---

[31] (...continued)
Vollrath's job to track where the product that he sold came from. Vollrath testified that he "just kept going about [his] business" and "sold to [his] customers." US Supp. App'x at 28. With respect to where the "tons came from," Vollrath testified that he "wouldn't know." *Id.* Carstens, in contrast, was personally involved in United Suppliers' mitigation efforts, and his testimony—in conjunction with United Suppliers' documentation—fully supports United Suppliers' position. Millard Feed also raises irrelevant and/or collateral issues with respect to alleged inaccuracies in United Suppliers' "record keeping." Resistance at 17. This contention has no bearing whatsoever on the instant Motion.

[32] It appears undisputed that the resales here were private sales. *See* Iowa Code § 554.2706 cmt. 4 ("By 'public' sale is meant a sale by auction. A 'private' sale may be effected by solicitation and negotiation conducted either directly or through a broker.").

45

argue that it would have taken some action to protect its interests if United Suppliers gave notice. *Cf. Mobil Oil Corp. v. Earhart Petro., Inc.*, 213 F.3d 632, at *3 (4th Cir. 2000) (Table) ("[The buyer] was entitled to reasonable notice of [the seller's] intention to make a private sale so that it could protect itself if [the seller] attempted to sell the goods at a steep discount and then sue for the difference between the sale price and the contract price. That is just what happened here."). In the absence of any prejudicial impact on the resale, the court finds that United Suppliers' alleged failure to give notice is immaterial.

### c.     *Reasonableness of resales*

Millard Feed argues that United Suppliers' resales were not commercially reasonable. Millard Feed submits that because the market "fell by 30 percent in the relevant time frame[,]" a "commercially reasonable resale would be expected to result in prices in the range of 70 percent of the Subject Contract prices." Resistance at 19. Millard Feed's contention that the market fell by 30 percent between June of 2009 and September of 2009 is unsupported by the record. Cook's testimony that the market "probably fell 30 percent" was specifically limited to the period "between July '08 when [Cook] signed the contracts and December of '08." MF App'x at 26.

In contrast, Carstens' testimony establishes the market "fell hundreds of dollars a ton" and remained low until 2010. US App'x at 27-28. Thus, Millard Feed's contention that the resales were not commercially reasonable because United Suppliers waited until September 2009 to sell is also without merit. Millard Feed sets forth no evidence to controvert United Suppliers' evidence that its resales were "the absolute best [United Suppliers] could do" in the then existing market. *Id.* at 27. In contrast with United Suppliers' evidence detailing its reasonable mitigation efforts, Millard Feed offers no evidence as to what a commercially reasonable price would have been or what effect an earlier resale would have had. Accordingly, the court finds that Millard Feed has failed to show a genuine issue for trial as to whether United Suppliers' resales were commercially

reasonable.

### d.    *Evidence of damages*

Millard Feed contends that United Suppliers has not put any evidence in the record showing the market price of the relevant product at the times and places specified in the Subject Contracts. Millard Feed draws such a requirement from Iowa Code section 554.2708, which states that:

> the measure of damages for nonacceptance or repudiation by the buyer is the difference between *the market price at the time and place for tender* and the unpaid contract price together with any incidental damages . . ., but less expenses saved in consequence of the buyer's breach.

Iowa Code § 554.2708(1) (emphasis added).

Millard Feed misapprehends a seller's remedies under Iowa's UCC. An aggrieved seller may take a variety of actions, such as:

1.    withhold delivery of such goods;

2.    stop delivery by any bailee as hereafter provided (section 554.2705);

3.    proceed under section 554.2704 respecting goods still unidentified to the contract;

4.    resell and recover damages as hereafter provided (section 554.2706);

5.    recover damages for nonacceptance (section 554.2708) or in a proper case the price (section 554.2709);

6.    cancel.

Iowa Code § 554.2703.

Iowa Code section 554.2708, from which Millard Feed draws the market price evidence requirement, allows a seller to recover the difference between the market price and the contract price. With such a remedy, evidence of market price necessarily is required. United Suppliers, however, did not avail itself of this remedy. Instead, it chose

to resell and recover the difference under Iowa Code section 554.2706, which requires only that the resale be "made in good faith and in a commercially reasonable manner . . . ." Iowa Code § 554.2706(1). Because this remedy is based on the difference between the contract price and the price that the goods bring in a commercially reasonable resale, proof of market price is not required. *See Lodestar Holdings, Inc. v. Tenn. Valley Auth.* (*In re Lodestar Energy, Inc.*), No. 07-5033, 2008 WL 3539734, at *2 n.5 (Bankr. E.D. Ky. Aug. 11, 2008) (noting distinction between prerequisites for recovery under UCC §§ 2-706 and 2-708). The court has already concluded that United Suppliers' resales were, as a matter of law, commercially reasonable. Because United Suppliers does not seek damages based on the market price under Iowa Code section 554.2708, its alleged failure to offer proof of market price is of no consequence.[33]

### 5. *Affirmative defenses and counterclaim*

In the Motion, United Suppliers also seeks summary judgment in its favor with respect to each of Millard Feed's affirmative defenses and its counterclaim. As United Suppliers notes, Millard Feed failed to resist the Motion as to several of its affirmative defenses. Accordingly, and for the reasons set forth in the Motion and United Suppliers' brief in support thereof, the court finds that United Suppliers is entitled to summary judgment on Millard Feed's affirmative defenses of failure to state a claim, illusory contracts, unconscionability and setoff.

The court has addressed Millard Feed's remaining affirmative defenses of failure to mitigate damages, excuse of performance and breach of fiduciary duty in the instant order. *See* Sections VII.C.1, 3 and 4, *supra*. For the reasons explained above, United Suppliers is entitled to summary judgment on these defenses as well.

Finally, the court shall also grant the Motion with respect to Millard Feed's

---

[33] In any event, the court believes that United Suppliers did offer evidence of market price as part of its mitigation evidence, which Millard Feed failed to rebut.

counterclaim for its initial payments under the Subject Contracts. The counterclaim is premised on the allegation that "United Suppliers failed to tender delivery under the orders placed by Millard Feed." Counterclaim at ¶ 7. As explained above, United Suppliers did not breach the Subject Contracts. Accordingly, Millard Feed is not entitled to a refund of its initial payments.[34]

## VIII. CONCLUSION

In light of the foregoing, the Motion (docket no. 35) is **GRANTED**. The parties' Motions in Limine (docket nos. 43 & 44) are **DENIED AS MOOT**. The Clerk of Court is **DIRECTED** to **ENTER JUDGMENT** in Plaintiff's favor in the amount of $462,230.38 with interest at the rate of 1% per month and to **CLOSE THIS CASE**.

**IT IS SO ORDERED.**

**DATED** this 21st day of January, 2011.

_____
LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

---

[34] Additionally, when calculating its damages, United Suppliers gave Millard Feed credit for the initial payments.